**Anthony LESLIE, Petitioner,**

v.

**Christopher ARTUZ, Respondent.**

**No. 98 Civ. 9129(RWS).**

United States District Court, S.D. New York.

Oct. 21, 1999.

---

**18.** *Id.*

**19.** 983 F.Supp. 478.

**20.** *Id.* at 484.

Robert J. Boyle, New York City, for petitioner.

Honorable Robert M. Morgenthau, District Attorney of New York County, New York City (Ellen Sue Handman, Assistant District Attorney, Marc Frazier Scholl, Assistant District Attorney, of counsel), for respondent.

## OPINION

SWEET, District Judge.

Anthony Leslie ("Leslie") has petitioned this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the following grounds: (1) he was denied his right to counsel when he was represented by a non-attorney during critical stages of his trial, and was denied due process of law when the trial court failed to conduct an evidentiary hearing concerning that defect in representation; (2) he was denied effective assistance of counsel because his representatives failed to (a) meaningfully cross-examine the prosecution's ballistics expert, (b) effectively present the testimony of a ballistics expert testifying in Leslie's defense, (c) move to suppress both money and a watch seized from Leslie as a result of his "unconstitutional seizure", (d) make a motion to preclude the prosecution from utilizing Leslie's prior convictions during cross examination, (e) conduct an adequate pretrial investigation, (f) make a timely application, pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), concerning the prosecution's use of peremptory challenges, (g) move to dismiss the indictment on the grounds that the prosecution had failed to establish a legally sufficient case, and (h) object to and move for a mistrial based upon the prosecutor's "erroneous and prejudicial" comments during summation; (3) the prosecutor's use of peremptory challenges constituted a violation of *Batson*, 476 U.S. at 79, 106 S.Ct. 1712; (4) he was denied due process of law by being convicted upon insufficient evidence; (5) he was denied due process of law by the prosecutor's comments, in summation, con-

cerning matters not in evidence; and (6) he was denied due process of law when the trial court admitted irrelevant and prejudicial evidence concerning money and a watch recovered from Leslie after his arrest.

For the reasons set forth below, the petition is dismissed.

### The Parties

Leslie is presently incarcerated at Green Haven Correctional Facility ("Green Haven") in Stormville, New York pursuant to the judgment of conviction at issue.

Christopher Artuz ("Artuz") is the Superintendent of Green Haven.

### Facts and Prior Proceedings

By an indictment filed December 4, 1987, Leslie was charged with one count each of Attempted Murder in the First Degree, Assault in the Second Degree, and Criminal Possession of a Weapon in the Second and Third Degrees.

In a June 29, 1988 judgment of the Supreme Court, New York County, Leslie was convicted of Attempted Murder in the First Degree, a violation of New York Penal Law § 100.00, 125.27(1)(a)(i). The judgment came after a two-day long jury trial at which the Honorable Harold J. Rothwax presided. Leslie was sentenced to a term of incarceration of from twenty-five years to life.

### A. The Trial

### 1. The People's Case

At approximately 11:00 p.m. on November 17, 1987, police officers patrolling in an unmarked car spotted a Suzuki Samurai with tinted windows and out-of-state plates driving slowly around 159th street in upper Manhattan. Periodically, the car would slow down or stop, and pedestrians would approach the car to peer inside— only to walk away quickly, looking back over their shoulders. The officers observed this behavior for some time. At a time when the car was temporarily parked, the officers put an "FBI" light on their dashboard and approached the car on foot. A pedestrian who had been leaning in the window of the car then ran away. The vehicle had two occupants.

Officer John Negus ("Negus") asked Leslie, the driver, for his license and registration, while Officer Donald Drogin ("Drogin"), approached the passenger. Drogin noticed that Leslie's passenger appeared to be nervous, and Negus observed hesitation on the part of Leslie to switch off the car's ignition. Negus also observed that Leslie pulled a jacket in front of him and moved his hands towards his wallet. Drogin told Negus that something was wrong, and the officers ordered both men out of the car. They complied, but Leslie sidestepped toward the rear of the car while repeatedly moving his hands towards his waist. After warning Leslie about this, Officer Negus then reached over and felt what he believed to be a gun in Leslie's waistband. At that moment, Leslie struck Negus in the head with his elbow and produced a black metal object with some white showing, pointing it at Drogin. Negus warned Drogin that Leslie had a gun. Drogin looked up and saw a gun waved in his direction, and pushed the passenger to the hood of the car. At that point, Leslie swung the object in the direction of Negus, pointing it at his head. Negus ducked underneath the object, heard a loud, metallic click, and ran Leslie into the car backwards, causing Leslie to throw or release it such that it landed on the other side of the street.

After a struggle, and with the assistance of backup officers, Leslie was restrained and a handgun ("the gun") recovered from the scene. The gun, which was pearl-handled with a black barrel and was loaded with six rounds, had its hammer closed. The gun's handle was also partially broken, which the officers attributed to its impact with the ground. The bullet recovered from the firing chamber ("the bullet") had a slight indentation in its primer.

At trial, the prosecution produced a ballistics expert, Detective Robert Cotter ("Cotter"), who testified that the gun and ammunition were operable, but that he could not specifically identify the cause of the shallow indentation in the bullet's primer. Cotter also testified that the indentation was not sufficiently deep such that he could identify it as being caused by a firing pin of a handgun.

## 2. *The Defense's Case*

The essence of the defense's theory at trial was that Leslie had never pulled a firearm on the police, that Negus and Drogin were lying, and that, for reasons unknown, the officers had framed Leslie. At trial, the defense contended, *inter alia*, that the prosecution's explanation of events did not make sense, that the handgun found by the police functioned perfectly well and would not have misfired had Leslie actually attempted to shoot Negus, that the imprint left on the bullet could not be traced to the handgun recovered from the scene or even a firing pin from any gun, and that had Leslie actually attempted to shoot an experienced police officer such as Negus, he would have likely been shot himself. The defense also questioned the police's decision not to test the handgun recovered from the scene for fingerprints.

The defense's only witness at trial was Robert Breglio ("Breglio"), a ballistics expert whose testimony focused on the denting of the primer. In the main, Breglio's testimony paralleled that of Cotter. Breglio testified, for example, that while the bullet's indentation could have been made by a gun, one could not say that it was necessarily made by a gun rather than some other tool, such as a nail or a "punch." Breglio also testified that a "misfire" would have resulted in a firing pin impression every bit as deep as a fired bullet, and that a misfire occurs when the firing pin hits the primer sufficiently hard, but for some reason does not ignite it.

## 3. *Leslie's Representation at Trial*

After his initial arrest, Leslie retained Terrence Green ("Green") to represent him. In addition, Leslie's family retained Blaine A'mmon White ("White"), an attorney admitted to practice law in Pennsylvania, the District of Columbia, and several federal courts. White was not admitted, however, in New York. On February 11, 1988, Green sought an order admitting White in New York *pro hac vice*. In his motion papers seeking White's admission, Green represented that he was an attorney duly licensed to practice law in New York, and that he would accompany White at "each and every stage of this proceeding."

Despite Green's representations, however, Green had never been admitted to the bar of any State, had never graduated from law school, and was not licensed to practice law in any manner. Green was, in common parlance, an "imposter" lawyer.

At trial, White delivered the opening statement, cross-examined three of the People's four witnesses, and gave the defense summation. Most, but not all, of the defense's exchanges with the court and with opposing counsel, including side-bar discussions, featured White rather than Green. Green's involvement at trial was predominately ballistics-related. Green questioned the ballistics expert called to testify for the People, and presented the only witness for the defense—Breglio. A review of the record also reveals that Green was present at the laboratory tests conducted on the gun recovered from the crime scene. On a number of occasions throughout the trial, Green objected to the prosecutor's line of questioning on a variety of matters.

Leslie was represented at sentencing by both White and Green, though the record indicates that only White played an active role during the proceedings, which included a colloquy concerning a defense motion to vacate Leslie's conviction.

### B. *Post–Conviction Proceedings*

On July 7, 1988, Leslie filed a timely Notice of Appeal to the Appellate Division, First Department.

On appeal, Leslie initially contended that: (1) there was insufficient evidence to prove Leslie's guilt beyond a reasonable doubt, and that his conviction was therefore improper under *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); (2) he was denied a fair trial by the prosecutor's improper comments during summation; and (3) his sentence was excessive.

In 1990, Leslie wrote the Departmental Disciplinary Committee of the First Department to complain about Green. By letter dated April 26, 1990, the Committee notified Leslie that Green was, in fact, not licensed to practice law in New York. It was later learned that Green had never attended law school, and was not licensed to practice law in any state.

In January of 1992, Leslie moved to vacate the judgment, contending that Green's impersonation had denied him the effective assistance of counsel and prejudiced his defense. By supplemental affirmation dated February 20, 1992, Frances Gallagher, of counsel at the Legal Aid Society, urged vacatur of Leslie's conviction, pressing that representation by Green was tantamount to no representation at all, and that Leslie's conviction should therefore be reversed. The People opposed Leslie's motion, noting White's extensive participation at trial and Green's limited role. Leslie's direct appeal was held in abeyance pending resolution of this motion.

In a decision dated April 17, 1992, Judge Rothwax denied Leslie's motion. *See People v. Leslie*, 154 Misc.2d 325, 586 N.Y.S.2d 197 (N.Y.Sup.1992) (*"Leslie I"*). In that decision, Judge Rothwax held, *inter alia*, that Green's participation at trial did not have an adverse impact upon the defense presented, given that White ably conducted the lion's share of the defense and was present at all times in the courtroom to protect Leslie's interests.

On July 2, 1992, the First Department granted Leslie's application to appeal from the denial of his motion to vacate the judgment, and ordered that that appeal be consolidated with Leslie's direct appeal.

In February 1993, Leslie submitted a supplemental brief in which two additional claims were raised on appeal: (1) that Leslie's judgment of conviction should be vacated because he was represented by a non-lawyer at a critical stage of the criminal proceedings, and (2) that in violation of *Batson*, 476 U.S. at 79, 106 S.Ct. 1712, the prosecutor had made discriminatory use of his peremptory challenges to exclude African–Americans from the jury.

On March 25, 1993, the First Department vacated a previous order assigning Leslie counsel, given a motion by Leslie's newly-retained attorney to be substituted as counsel. The First Department also struck the previously filed brief of assigned counsel.

Leslie's new counsel filed briefs claiming, *inter alia*, that Leslie had been denied his right to counsel, that he had been denied effective assistance of counsel, that the trial court had erred in failing to hold an evidentiary hearing concerning Leslie's motion to vacate his conviction, that he had been deprived of his right to a fair trial because of prejudicial comments made by the prosecutor, that the trial court abused its discretion by admitting testimony concerning the money and watch recovered from Leslie, and that he had been convicted upon legally insufficient evidence.

On September 25, 1997, the First Department affirmed both Leslie's conviction and Judge Rothwax's decision in *Leslie I*. *See People v. Leslie*, 232 A.D.2d 94, 662 N.Y.S.2d 761 (1st Dep't 1997) (*"Leslie II"*). The First Department determined that, while Leslie had been jointly represented by an imposter and a bonafide attorney appearing *pro hac vice* upon a motion by the impostor, Leslie was not denied

either his right to counsel or effective assistance of counsel such as would warrant vacatur of his conviction. The Court noted that White acted as lead counsel, conducted every critical phase of the trial except for that related to the equivocal and non-incriminatory ballistics evidence, and otherwise provided Leslie with meaningful representation. Under such circumstances, the First Department decided that Leslie had failed to meet his high burden of demonstrating that the impostor's presence and participation, and/or the legitimate attorney's incompetence, denied him effective assistance of counsel or deprived him of a fair trial. In addition, the Court found that counsel's failure to pose objections to several of the prosecutor's allegedly prejudicial comments during summation did not demonstrate that Leslie was denied effective assistance of counsel. The Court noted that in each instance, the prosecutor's remarks represented either fair comment on the evidence, acceptable summation rhetoric, or a minor misstatement of testimony not reasonably likely to create undue prejudice to Leslie or deny him a fair trial. The Court also decided that there was no merit to Leslie's remaining claims that the trial evidence was legally insufficient to prove his guilt, that the verdict was against the weight of the evidence, or that Leslie's sentence was excessive.

In a subsequent letter requesting leave to appeal to the New York Court of Appeals, Leslie claimed that he had been denied his right to counsel and to effective assistance of counsel. Leslie further asserted that his conviction had been secured in violation of *Batson*, 476 U.S. at 79, 106 S.Ct. 1712, despite the fact that this issue had not ultimately been presented to the First Department. In response, the People argued that no further review of the counsel issues discussed in *Leslie I* and *Leslie II* was necessary, and that Leslie's *Batson* claim was both unpreserved and factually insufficient. Leslie's application for leave to appeal was summarily denied on December 18, 1997. *See People v. Les-*

*lie*, 91 N.Y.2d 875, 668 N.Y.S.2d 574, 691 N.E.2d 646 (1997) (*"Leslie III "*).

Leslie did not file a certiorari petition with the United States Supreme Court. On December 28, 1998, he filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. After affording the People an opportunity to respond to Leslie's petition and accepting briefing materials from both parties, the petition was deemed fully submitted as of June 15, 1993.

### Discussion

#### I. Leslie's Petition Was Timely Under 28 U.S.C. § 2244(d)(1)

The New York Court of Appeals denied Leslie's application for leave to appeal on December 18, 1997, and Leslie did not file any petition for a writ of certiorari to the Supreme Court. The present petition was not filed until December 28, 1998. The People have pressed that the petition is therefore time-barred, because more than one year had passed since the Court of Appeals had denied Leslie's application for leave to appeal. Leslie has countered that his petition is timely, given that his time to file a petition for certiorari expired only on March 18, 1998.

The question presented is thus whether, as modified by the Antiterrorism and Effective Death Penalty Act (the "AEDPA"), 28 U.S.C. § 2244's one-year limitations period should be counted from the last state court action of moment or the expiration of time to seek review from the Supreme Court. The applicable statutory language indicates that the one-year period shall be counted from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).

■ The Court adopts the position, taken by a number of other courts within this Circuit, that the one-year limitations period only begins to run after expiration of the defendant's time to seek a writ of

certiorari from the United States Supreme Court. *See Carracedo v. Artuz*, 51 F.Supp.2d 283, 284 (S.D.N.Y.1999) ("The weight of authority favors the view that the 'conclusion of direct review,' as that phrase is used in 28 U.S.C. § 2244(d)(1) as applied to cases in which certiorari either is not sought or is sought unsuccessfully, occurs on the date on which the time within which to petition for a writ of certiorari expires or, if a writ is sought unsuccessfully, the petition is denied."); *Vasquez v. Greiner*, 68 F.Supp.2d 307, 308 (S.D.N.Y. 1999) ("Vasquez did not file a petition for a writ of certiorari in the United States Supreme Court, and his conviction consequently became final when the ninety day period for seeking certiorari expired...."); *Manley v. Kelley*, 60 F.Supp.2d 121, 121–23 (S.D.N.Y.1998) (finding that petition for writ of certiorari is considered part of "direct review" under established Supreme Court precedent, and that Section 2254(d)(1)(A)'s limitations period therefore does not include time in which certiorari may be sought); *see also Ross v. Artuz*, 150 F.3d 97, 98 (2d Cir. 1998) (noting that petitioner's conviction became final for purposes of Section 2244(d) "when his time to seek direct review in the United States Supreme Court by writ of certiorari expired"); *Smith v. Bowersox*, 159 F.3d 345, 347–48 (8th Cir. 1998) (running of limitations period triggered by conclusion of certiorari proceedings or expiration of time allotted for filing petition for writ), *cert. denied*, — U.S. —, 119 S.Ct. 1133, 143 L.Ed.2d 126 (1999).

Leslie's petition is therefore not time-barred.

## II. *Leslie's Batson Claim Does Not Afford Him Relief From the Judgment of Conviction*

Leslie has claimed that the prosecutor at his trial used peremptory challenges in a discriminatory fashion, and that the trial judge improperly denied him a hearing on this issue.

At trial, White challenged the prosecution's use of nine of its allotted twenty peremptory challenges to strike African-Americans from the jury. The prosecution only used a total of thirteen challenges during jury selection.

In rejecting White's challenge, Judge Rothwax remarked that the *Batson* issue had not been raised in a timely fashion, given that the venire had already been excused and the jurors impaneled. He also noted that the prosecution had not used all of its challenges, and that despite a predominately white venire panel, the jury ultimately selected contained "five blacks, two Asians and one Hispanic."

According to the People, Leslie's *Batson* claim has been improperly raised in the instant petition, as it was never formally presented on appeal to the First Department.[1] Though Leslie did raise such a claim in his later application for leave to appeal to the Court of Appeals, that application was denied in a summary decision without explanation. According to the People, this denial indicates an acceptance by the Court of Appeals of the State's briefed position that Leslie had failed to preserve any *Batson* claim. Leslie responds that the Court of Appeals' cryptic decision does not allow any conclusion that that court's decision rested on a state procedural ground.

Resolution of this issue is unnecessary, however, as Leslie fully concedes that it was only after the selected jurors had been sworn and impaneled, and the venire dismissed, that White voiced any concerns about the prosecution's use of its peremptory challenges.

As the Second Circuit has explained, a *Batson* claim is untimely when raised after the conclusion of jury selec-

---

1. The *Batson* claim appears to have been raised in a brief initially filed on Leslie's behalf by the Legal Aid Society, but later strick-en at the request of replacement counsel retained by Leslie. The *Batson* claim was not raised in replacement counsel's papers.

tion, *see McCrory v. Henderson*, 82 F.3d 1243, 1249 (2d Cir.1996); *United States v. Franklyn*, 157 F.3d 90, 96 (2d Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 887, 142 L.Ed.2d 786 (1999), in part because it is only then that the trial court can contemporaneously assess the use of peremptory challenges and remedy any improper conduct without requiring repetition of the jury selection process. Leslie has not offered any substantive opposition to this proposition, other than a general protestation that it was only after jury selection had been completed that the disproportionate use of peremptory challenges was truly manifest, and a few efforts to distinguish the facts of *McCrory* from the case at bar. Though *McCrory* concerned a delay in raising the *Batson* claim of more than three months, *see McCrory*, 82 F.3d at 1244, it is noteworthy that the *Franklyn* court upheld a determination that a *Batson* claim was untimely where it was not raised until after dismissal of the challenged jurors and a lunch recess. *See Franklyn*, 157 F.3d at 97.

Since the *Batson* challenge was untimely under Federal law, Leslie has failed to establish any basis for relief on this claim.

### III. *Leslie Has Not Established that the Evidence Presented At His Trial Was Insufficient to Warrant His Conviction*

In his petition, Leslie has claimed that he was denied due process of law under the Fifth and Fourteenth Amendments to the United States Constitution "when he was convicted upon evidence which was insufficient as a matter of law," in violation of the precepts set forth in *Jackson*, 443 U.S. at 307, 99 S.Ct. 2781.

■ Section 2254(d)(1) provides that a writ may not issue unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established law, as determined by the Supreme Court of the United States." By posing the question of whether the state court's treatment was "unreasonable," Section

2254(d)(1) requires the federal court "to take into account the care with which the state court considered the subject." *Lindh v. Murphy*, 96 F.3d 856, 871 (7th Cir.1996) (*en banc*), *rev'd on other grounds*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). With the United States Supreme Court as setting the bounds of what is "reasonable," a "responsible, thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment." *Id.*

■ The Supreme Court has held that a federal court must order "habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 324, 99 S.Ct. 2781. In determining the sufficiency of the evidence, the court must view the evidence in the light most favorable to the prosecution, *id.* at 319, 99 S.Ct. 2781, and decide whether the record is "so totally devoid of evidentiary support that a due process issue is raised." *Mapp v. Warden, New York State Correctional Inst. for Women*, 531 F.2d 1167, 1173 n. 8 (2d Cir.1976).

■■ It is well settled, moreover, that "the jury is exclusively responsible for determining a witness' credibility." *Bossett v. Walker*, 41 F.3d 825, 830 (2d Cir.1994) (citations omitted); *see Maggio v. Fulford*, 462 U.S. 111, 113, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983). Ultimately, the jury heard the testimony at issue and resolved any issues of witness credibility in the prosecution's favor. It is not the province of a federal court on habeas review to reassess the credibility of a witness it has not observed. *See Marshall v. Lonberger*, 459 U.S. 422, 432, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983); *Joyner v. Leonardo*, No. 99 Civ. 1275(DC), 1999 WL 608774, at *6 (S.D.N.Y. Aug.12, 1999).

■ Pursuant to the version of New York Penal Law § 125.27(1)(a)(i) under which Leslie was indicted, a person is

guilty of an Attempt to Commit Murder in the First Degree when he intentionally tries to kill a police officer engaged in the course of performing official duties. Under this standard there was sufficient evidence presented from which the jury could infer that Leslie intended to cause the death of a police officer. At trial, the prosecution offered evidence that Leslie pointed a loaded firearm at Drogin, at Negus' head, and that Negus heard a loud, metallic "click." Evidence adduced at trial also indicated that the hammer of the gun recovered from the scene contained a cartridge in its firing chamber, that the hammer of gun was down, and that the cartridge's primer was slightly dented—though neither of the two experts at trial could say that the impression was due to a frustrated effort by Leslie to shoot Negus. It is certainly not beyond reason that a rational jury could conclude from such evidence that the "click" Negus heard was attributable to Leslie's attempted firing of the gun, and that Leslie intended to shoot Negus in the head. *See People v. Mohammed,* 151 A.D.2d 1018, 1019, 542 N.Y.S.2d 82, 83 (4th Dep't 1989) (finding evidence legally sufficient to support conviction for attempted murder where defendant pulled trigger, even though gun jammed).

Leslie claims that, nevertheless, there was not constitutionally sufficient evidence to support his conviction. Specifically, Leslie asserts that, even assuming that the evidence offered at trial supports an inference that Leslie pulled the gun's trigger, the evidence also indicated that Negus had already ducked underneath the gun and was "not in danger of being shot." This is a curious position, however, and an unpersuasive one at that. It strains credulity to assert that an effective evasive maneuver by Negus, executed within scant moments of having a firearm pointed at his head, could have such a result.

On direct appeal the Appellate Division found Leslie's claim of insufficient evidence to be "meritless." This Court is in

agreement. Consequently, Leslie's petition for habeas relief on the ground of insufficient evidence is denied. *See Reddy v. Coombe,* 846 F.2d 866, 869 (2d Cir.1988).

### IV. *The Prosecutor's Summation Remarks Did Not Deprive Leslie of a Fair Trial*

 A prosecutor's statements amount to reversible prosecutorial misconduct if the "remarks were so prejudicial that they rendered the trial in question fundamentally unfair." *Garofolo v. Coomb,* 804 F.2d 201, 206 (2d Cir.1986); *see also Donnelly v. DeChristoforo,* 416 U.S. 637, 645, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). To be a constitutional violation, the remarks must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly,* 416 U.S. at 643, 94 S.Ct. 1868 (1974); *see Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); *Concepcion v. Portuondo,* No. 97 CIV 3183 JGK, 1999 WL 604951, at *4 (S.D.N.Y. Aug.10, 1999).

 As the Court of Appeals for the Second Circuit has explained, to obtain habeas relief as a result of inappropriate prosecutorial remarks a petitioner bears the burden of "demonstrat[ing] that he suffered actual prejudice because the prosecutor's comments … had a substantial and injurious effect or influence in determining the jury's verdict." *Bentley v. Scully,* 41 F.3d 818, 824 (2d Cir.1994). A three-factor test has been applied in determining the existence of "substantial prejudice" where a prosecutor's summation is challenged, consisting of the following criteria: (1) "the severity of the misconduct"; (2) "the measures adopted to cure the misconduct"; and (3) "the certainty of conviction absent the improper statements." *United States v. Modica,* 663 F.2d 1173, 1181 (2d Cir.1981) (*per curiam*); *see Bentley,* 41 F.3d at 824 (*citing Gonzalez v. Sullivan,* 934 F.2d 419, 424 (2d Cir.1991)).

A broad range of rhetorical devices are allowed in closing arguments without requiring reversal. *See United States v. Marrale*, 695 F.2d 658, 667 n. 9 (2d Cir.1982) (characterization of defense as "woven out of the thread of desperation and thread that unravels [sic] before you" did not deprive the defendant of a fair trial); *Modica*, 663 F.2d at 1181 (noting that prosecutor's occasional use of phrases such as "I'm telling you" or "I suggest to you" would "simply [be] fair argument"); *United States v. Peterson*, 808 F.2d 969, 977 (2d Cir.1987) (reference to witness's rap sheet "longer than the jury rail" and characterization of defendant's testimony as a "lie" was not improper).

Leslie claims that the prosecutor mischaracterized evidence presented at trial by, *inter alia:* (1) inviting the jury to themselves compare the positioning of the cartridge indentations in order to conclude that the test-fired cartridges and the cartridge with the shallow impression all bore the mark of the same firing pin, despite the absence of any expert opinion on this issue; (2) suggesting that a misfire could have occurred if a piece of cloth became caught in the hammer of the gun; and (3) stating that Officer Negus heard the "unmistakable" click of a trigger being pulled and a hammer going down, when the only admissible evidence offered at trial was that Negus heard a loud, metallic click. Leslie also presses that the prosecutor improperly offered his personal view on Leslie's guilt by stating, in response to the defense's contention that Leslie had no motive to attack the police officers, that "we know what [Leslie's] intent was and that was to kill Police Officer Negus."

As explained above, however, the standard for reversal of a criminal conviction based upon improper prosecutorial comments is extremely high. In light of this standard, this Court cannot say that the prosecutor's comments had a substantial or injurious effect on the jury's decision.

First, at multiple points throughout the trial Judge Rothwax cautioned the jurors that statements made by attorneys during either the opening arguments or the closing statements are not evidence, and were not to be considered by the jurors as such.

Second, the prosecutor's use of the royal "we" seems less a personal statement of belief, when read in the context of the prosecutor's summation and, more specifically, the passages immediately preceding the comment, than a rhetorical flourish that did not result in any prejudice to Leslie. *See United States v. Williams*, 583 F.2d 1194, 1201 (2d Cir.1978) (prosecutor's use of phrase "we know" not improper; noting that "[t]here is no proof or indication that the term "we" was used, or intended, or taken by anyone, to mean any person or group other than the total accumulation of people gathered in the courtroom, or that it was used to suggest personal knowledge of the prosecutor outside the record"); *United States v. Chin*, 910 F.Supp. 889, 898 (E.D.N.Y.1995) (prosecutor's occasional use of such phrases as "we know" and "I submit" was not impermissible).

Third, while several of the prosecutor's comments regarding the firearm went beyond the four corners of expert testimony at trial, they did not stray so far as to have been beyond the confines of the evidence produced at trial. After all, the jury was not required in the first instance to depend exclusively on the expert testimony presented in coming to its conclusions. Furthermore, comments such as the prosecutor's remark that an item of clothing could have caught the hammer of the gun are merely reasonable extrapolations from other evidence submitted to the jury.

The Court thus finds itself in agreement with the First Department that "[i]n each instance, the remarks represented either fair comment on the evidence, acceptable summation rhetoric, or [at worst] a minor misstatement of testimony not reasonably likely to create undue prejudice to [the] defendant." *Leslie II*, 232 A.D.2d at 100,

662 N.Y.S.2d at 765. Furthermore, to the extent that any comments were made in error, they were not so prejudicial that they rendered the trial in question fundamentally unfair. *See Garofolo,* 804 F.2d at 206.

## V. Leslie Has Established No Prejudicial Error in the Admission of Testimony Concerning Property Recovered During a Custodial Search

■ Leslie presses that his conviction must be vacated because Judge Rothwax erroneously allowed the prosecutor to elicit testimony concerning property recovered from Leslie after his arrest. At trial, Officer Drogin testified that he recovered $4,000 and an "expensive" watch from Leslie when he performed a thorough search at the Precinct house, and that he delivered the money to the Property Clerk. Leslie and the People stipulated at trial that the money and watch initially taken from Leslie at the Precinct were ultimately returned to him.

At trial, White had sought an advance ruling from Judge Rothwax concerning the People's use of testimony concerning the money and watch. Despite initial misgivings about the relevance of these items, Judge Rothwax concluded that they were admissible given that the defense challenged the officers' veracity and claimed the prosecution to be the result of a frame-up. Judge Rothwax allowed the prosecution to raise the recovery of the property on redirect, though he instructed the prosecutor not to elicit any testimony concerning the denominations in which the $4,000 was recovered.

A review of the record indicates no reason to believe that the jury would have utilized the information about the property recovered from Leslie to improperly conclude that Leslie intended to kill a police officer. This was not a case, for example, in which the prosecution sought to convict Leslie for narcotics offenses, and the money recovered might lead jurors to assume, improperly, that the defendant was engaged in illegal trafficking.

Here, the ultimate issue presented to the jury was whether they believed Leslie intended to shoot and kill a police officer. The recovery of large amounts of money, whatever else it might lead a juror to infer, would be unlikely to influence the jury's evaluation of this issue.

Moreover, in the People's summation, the prosecutor's reference to the money and watch explicitly indicated to the jury the purposes for which the evidence had been admitted. Referring to the defense's contention that the officers were lying, the prosecutor remarked that the officers' vouchering and return of the money would not make sense if Negus and Drogin were, in fact, dishonest.

In *Leslie II,* the First Department found that admission of this evidence, deemed relevant to credibility issues raised by Leslie regarding the honesty of Officers Drogin and Negus, constituted an appropriate exercise of the trial court's discretion. *See* 232 A.D.2d at 100, 662 N.Y.S.2d at 765. Even if this Court were to disagree with this notion, the admission of such evidence was not prejudicial. Consequently, Leslie's petition is dismissed insofar as it seeks relief on this claim.

## VI. Leslie's Simultaneous Representation By White and Green Does Not Constitute Per Se Error; Leslie Has Not Established Any Conflict of Interest Requiring A New Trial

■ In his petition, as in his state court proceedings, Leslie has steadfastly maintained that Green's representation during "critical stages" of his trial compromised his Sixth Amendment right to counsel, requiring automatic reversal of his conviction without regard to the actual effectiveness of the defense team's representation. The People have countered that the instant case does not occasion an invocation of such a *"per se"* reversal rule.

The Court concludes that, given the unique circumstances of Leslie's representation at trial, the *per se* reversal rule traditionally applied where a defendant is represented by an imposter lawyer does not apply to the facts of Leslie's case.

■■■■ As Leslie has correctly observed, a defendant's representation by an imposter attorney—one who has never been licensed or authorized to practice law in any jurisdiction—requires reversal. *See United States v. Novak*, 903 F.2d 883, 887–88 (2d Cir.1990) (representation by imposter at trial is *per se* reversible error, given defendant's right to representation by licensed attorney-at-law); *Solina v. United States*, 709 F.2d 160, 168 (2d Cir.1983) (representation by imposter constitutes "jurisdictional" defect not amenable to harmless error review). This *"per se"* rule of reversal applies even where the evidence of the defendant's guilt was overwhelming, or where the imposter's representation was otherwise competent. *See Solina*, 709 F.2d at 163, 168. While the Second Circuit has periodically expressed a lack of enthusiasm for applying this rule, *see Guerrero v. United States*, 186 F.3d 275, 279 (2d Cir.1999) (*citing Bellamy v. Cogdell*, 974 F.2d 302, 306 (2d Cir.1992) (*en banc*)), there is little question but that a defendant solely represented by an imposter would be entitled to relief under Section 2254.

The Second Circuit has also recognized that a defendant's representation may be inherently suspect under a conflict-of-interest analysis, given that a vigorous defense might potentially expose an imposter, or an attorney implicated in the defendant's crimes, to scrutiny and lay bare his or her illegal behavior. *See Guerrero*, 186 F.3d at 279–80; *Bellamy*, 974 F.2d at 306–07; *Novak*, 903 F.2d at 888; *United States v. Cancilla*, 725 F.2d 867, 870 (2d Cir.1984); *Solina*, 709 F.2d at 164–65.

Moreover, in a distinct—if logically related—line of authority, courts have found a violation of Sixth Amendment rights where counsel was absent, either physically or constructively, for part of a trial or other critical stages of a criminal proceeding. *See Tippins v. Walker*, 77 F.3d 682, 684, 686–87 (2d Cir.1996) (holding that rule of *per se* prejudice applies where counsel was "repeatedly unconscious at trial for periods of time in which defendant's interests were at stake"); *Green v. Arn*, 809 F.2d 1257, 1263 (6th Cir.), *vacated on other grounds*, 484 U.S. 806, 108 S.Ct. 52, 98 L.Ed.2d 17 (1987), *reinstated*, 839 F.2d 300 (6th Cir.1988) (finding Sixth Amendment deprivation where counsel absent during afternoon of trial; harmless error inquiry inappropriate if counsel absent during taking of evidence on defendant's guilt); *see also Henderson v. Frank*, 155 F.3d 159, 171 (3d Cir.1998) (finding that prejudice presumed and entire criminal proceeding "contaminated" where defendant's counsel was absent from suppression hearing); *French v. Jones*, 41 F.Supp.2d 726, 733–34 (E.D.Mich.1999) (finding that automatic reversal of conviction required where counsel not present during re-instruction of jury, despite "short-lived" nature of deprivation). *But see Vines v. United States*, 28 F.3d 1123, 1127–29 (11th Cir.1994) (finding that trial counsel's temporary absence during taking of evidence did not constitute *per se* error, and did not prejudice defendant); *but c.f. Duncan v. Griener*, No. 97 Civ. 20890, 1999 WL 20890, at *12 (S.D.N.Y. Jan.19, 1999) (counsel's temporary absence from month-long trial did not violate clearly established Federal right, as defendant consented to absence and was represented by co-defendant's counsel during absence).

Had Green been Leslie's sole, or even primary, representative at trial, or had White not been present during selected portions of the trial, a more difficult question would be presented. However, as Judge Rothwax—the presiding judge at trial—observed in *Leslie I*, and as an independent review of the record makes clear, White was both present throughout the trial and assumed a preeminent role in

Leslie's defense. Leslie was, in fact, represented by a bonafide lawyer throughout the entire trial. Unlike *Novak*, where the defendant was represented by both local counsel and an imposter, and the local counsel failed to actively represent the defendant at trial,[2] Leslie was vigorously represented by a lawyer throughout all critical stages of his trial.

Under such circumstances, the *per se* reversal rule articulated in *Solina* and *Novak* does not necessarily apply. *C.f. United States v. Rosnow*, 981 F.2d 970, 972 (8th Cir.1992) (holding that logic of *Solina* does not apply and petitioners' Sixth Amendment rights are adequately protected "if co-counsel provides petitioners with effective assistance at all critical stages of the proceedings"). Moreover, while in *Novak* and other decisions the Second Circuit has indicated that an imposter's conflict of interest—presumed from his or her assumed desire to remain undiscovered—also demands reversal of the unwitting defendant's conviction, this presumption does not apply to White, who was himself licensed to practice law in other jurisdictions. *C.f. United States v. Aiello*, 900 F.2d 528, 532 (2d Cir.1990) (holding, in part, that *Solina* rule on conflict of interest did not apply "since it has never been in doubt that [defendant's counsel] . . . was an authorized attorney at the time of . . . [trial]," and "was not in danger of being exposed as some kind of impostor."). Other than a few conclusory assertions that White could have been aware that Green was not licensed, contrary to the trial judge's finding that White was unaware that Green was an imposter, Leslie has not provided the Court with anything indicating that the conflict rule first articulated in *Solina* should be applied in this case. Furthermore, Leslie has failed to convince the Court that reversal is required under the general conflict-of-interest standard set forth in *Cuyler v. Sullivan*, 446 U.S.

335, 349–50, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).

That White was himself not admitted in New York, and that his *pro hac vice* admission was secured by virtue of an application by Green, does not change this analysis. As a number of courts have held, the rules set forth in *Novak* and *Solina* do not apply where the defect in an attorney's admission is *de minimus* or where an attorney is licensed in foreign jurisdictions. *See Kieser v. People*, 56 F.3d 16, 17 (2d Cir.1995) (holding that *per se* rule does not apply where attorney was temporarily suspended and failed to move for *pro hac vice* admission, given that he was duly licensed in New Jersey); *Ferrara v. Keane*, 806 F.Supp. 472, 474 (S.D.N.Y.1992) (refusing to apply *Solina*, despite attorney's failure to apply for *pro hac vice* admission in New York, where attorney duly licensed in New Jersey), *aff'd*, 2 F.3d 403 (2d Cir.1993), *cert. denied*, 510 U.S. 897, 114 S.Ct. 265, 126 L.Ed.2d 217 (1993); *see also Guerrero*, 186 F.3d at 280–81 (finding that reversal of conviction not required because attorney suspended from practice before court in which defendant sentenced; noting that attorney's "disqualification in the Eastern District cannot be taken to mean that he was no 'counsel' at all"); *Novak*, 903 F.2d at 888 (observing that technical flaws in licensure, such as failure to seek admission to particular federal court or failure to comply with local rules requiring out-of-state attorney to be accompanied by local counsel, are not considered sufficient to deprive defendant of Sixth Amendment right to counsel).

Therefore, vacatur of Leslie's conviction is not required by virtue of Green's participation in Leslie's defense. Moreover, Judge Rothwax did not violate Leslie's due process rights by refusing to conduct an evidentiary hearing.

---

**2.** In fact, as the decision in *Novak* makes clear, the licensed local counsel in that case was excused from daily attendance during the trial and did not actively participate whatsoever aside from motion practice and jury selection. *See* 903 F.2d at 890–91.

## VII. Leslie Has Not Demonstrated Ineffective Assistance of Counsel

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see United States v. DiTommaso*, 817 F.2d 201, 215 (2d Cir.1987); *Roberts v. Scully*, 875 F.Supp. 182, 194 (S.D.N.Y. 1995), *aff'd*, 71 F.3d 406 (1995). To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate, first, that his counsel's representation fell below "an objective standard of reasonableness" under "prevailing professional norms," and, second, that without the unprofessional performance of counsel, a reasonable probability exists that the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 693–94, 104 S.Ct. 2052; *see also Guerrero*, 186 F.3d at 281; *United States v. Romero*, 54 F.3d 56, 59–60 (2d Cir.1995); *United States v. Vegas*, 27 F.3d 773, 777 (2d Cir. 1994). Both elements of this *Strickland* test must be satisfied before it can be concluded that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.

A petitioner seeking to establish constitutionally ineffective assistance of counsel must overcome "a strong presumption that counsel's conduct falls within the wide range of professional assistance; that is ... that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, 104 S.Ct. 2052 (*quoting Michel v. Louisiana*, 350 U.S. 91, 100–01, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

"[T]he *Strickland* standard is quite deferential." *Roberts*, 875 F.Supp. at 195. A conviction will not be overturned when counsel provided "reasonably effective assistance" to the petitioner. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. A claim of "constitutional dimension does not arise unless a lawyer's error is so egregious as to amount to a failure to provide minimal professional representation." *Roberts*, 875 F.Supp. at 195. Under the standard above, a counsel's tactical decisions, "even those that go awry, will not provide the factual predicate for a Sixth Amendment claim." *Id.; see United States ·v. Eisen*, 974 F.2d 246, 265 (2d Cir.1992).

As stated at the outset, Leslie has pressed that Green's involvement in his defense rendered his legal defense insufficient as a whole, given the fact that the defense's sole witness was examined by Green and that ballistics evidence was crucial to Leslie's defense. Leslie has also alleged a laundry list of oversights, such as his representatives' failure to move to suppress the money and watch seized from petitioner, make a motion to preclude the prosecution from using Leslie's prior convictions during cross examination, or conduct an "adequate" pretrial investigation, all of which he believes to have compromised his defense and resulted in his conviction.

However, Green's involvement in Leslie's defense, standing alone, does not compel the conclusion that Leslie was denied effective assistance of counsel. As explained above, White conducted the lion's share of the defense, cross-examined all of the witnesses with first-hand knowledge of the events that transpired on November 17, 1987, dominated the vast majority of colloquies with the court and with opposing counsel, and was present throughout Leslie's entire trial.

Moreover, a review of the trial transcript, while it does reveal that Green asked Breglio some awkward questions—concerning which Judge Rothwax requested clarification—indicates that Green's contributions at trial were coherent, and even helpful.

Furthermore, while Leslie has asserted that Green failed to present the defense's ballistics case meaningfully or to cross-examine Cotter effectively, the transcript reveals that Green was essentially successful at establishing the inconclusive nature of the ballistics evidence and the experts' unwillingness to opine that the cartridge indentation at issue was necessarily caused by the firing pin of the gun recovered from the scene. Leslie has failed to indicate anything that a properly licensed representative could have done that would have meaningfully changed this bottom line, or that would have made a difference in the mind of the jury during its deliberations.

Had Green been Leslie's sole representative, it would of course make little difference whether Green's performance at trial was competent. Under the rationale of *Solina*, after all, even representation by an imposter with the skills of Clarence Darrow requires reversal.

As explained above, however, White's primary involvement throughout Leslie's trial militates against an application of the *per se* rules set forth in *Novak* and *Solina*, and the *Strickland* inquiry is highly deferential. The record is therefore properly scrutinized to determine whether the representation provided was sufficiently competent to avoid reversal. Insofar as Leslie's representation is concerned, it was.

As far as Leslie's other ineffective assistance grievances are concerned, most of which concern alleged deprivations addressed and rejected in the instant opinion, the *Strickland* test's requirements have also not been met. These contentions are without merit.

### Conclusion

For the reasons set forth above, Leslie's petition for relief pursuant to 28 U.S.C. § 2254 is hereby dismissed.

The petitioner having made a substantial showing of a denial of a federal right, a certificate of appealability shall issue, pursuant to 28 U.S.C. § 2253, on the limited question of whether the nature of Green's representation violated Leslie's Sixth Amendment rights.

It is so ordered.